**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MARY CARR, individually and on behalf of all others similarly situated, | Case No. 1:24-cv-12387-AK |
| Plaintiff, | Hon. Angel Kelley |
| v. | |
| BG RETAIL, LLC and CALERES, INC., | |
| Defendants. | |

**STIPULATION AND ORDER CONCERNING PROTOCOL FOR PRODUCTION OF
ELECTRONICALLY STORED INFORMATION**

This Stipulation and Order Concerning Protocol for Production of Electronically Stored Information ("ESI Protocol") is entered into between Plaintiff Mary Carr ("Plaintiff") through her counsel, and Defendants BG Retail, LLC and Caleres, Inc. ("Defendants") through their counsel (each a "Party," and collectively, the "Parties").

WHEREAS, counsel for the Parties have met and conferred regarding discovery of electronically stored information ("ESI") in the above-captioned action, and have entered into this ESI Protocol to facilitate the just, speedy, and inexpensive conduct of discovery of ESI and to promote, to the fullest extent possible, the resolution of disputes regarding the discovery of ESI without Court intervention.

NOW THEREFORE, the Parties therefore stipulate and agree as follows:

I.    **DEFINITIONS**

A.    "**Electronically Stored Information**," or "**ESI**," as used herein, means and refers to computer generated information or data of any kind, stored in or on any Storage Media as defined in this section. The Parties agree to meet and confer regarding any disputes relating to relevancy, proportionality, or production issues before submission of any disputes to the Court.

-1-

B.    "**Native Data Format**" means and refers to the format of ESI in which it was generated and/or as used by the producing party in the usual course of its business and in its regularly conducted activities.

C.    "**Metadata**" means and refers to information about information or data about data, and includes, without limitation: (1) information embedded in or associated with a native file that is not ordinarily viewable or printable from the application that generated, edited, or modified such native file which describes the characteristics, origins, usage and/or validity of the electronic file and/or (ii) information generated automatically by the operation of a computer or other information technology system when a native file is created, modified, transmitted, deleted or otherwise manipulated by a user of such system.

D.    "**Documents**" includes writings, drawings, graphs, charts, photographs, sound recordings, images, and other data, data records or data compilations stored in any medium (including cloud-based or cloud sourced media) from which information can be obtained.

E.    "**Storage Media**" means an object or device, real or virtualized, including but not limited to a disc, tape, computer, server, mobile device, smartphone, tablet, iPad, Cloud (public, private or hybrid) or other device, or other similar means of communication, on which data is or was stored.

II.    **SEARCH TERMS FOR ELECTRONIC DOCUMENTS**

A.    **General Scope of Protocol**. The Parties agree that they will cooperate in good faith regarding the disclosure and formulation of appropriate search methodology, search terms and protocols, and any technology assisted review ("TAR") or predictive coding prior to using any such technology to narrow the pool of collected documents to a set to undergo review for possible production. The Parties agree to meet and confer as early as possible in the discovery process, to discuss, *inter alia*:

- Search methodology(ies) to be utilized (including but not limited to Boolean searches and technology assisted review/predictive coding);

- Disclosure and selection of all search terms, including foreign language and search terms based upon actual terminology used in the producing party's documents;

- Search protocol;

- The use of TAR or predictive coding and the methodology or data set under which TAR or the predictive coding will be configured; and

- Post-search error sampling and sampling/testing reports for TAR/predictive coding.

The Parties will continue to meet and confer regarding any search process issues as necessary and appropriate. Nothing in this protocol, or the subsequent designation of any search terms, shall operate to limit or expand a Party's production obligations under applicable law, or limit the ability to agree to meet and confer to modify the search terms, criteria, or methodologies as information is obtained and utilized in the course of the litigation.

This ESI protocol does not address or resolve any other objection to the scope of the Parties' respective discovery requests.

**B.      Procedures Governing the Use of TAR, Predictive Coding, Or Other Similar Methodology.**  Neither Party shall make use of TAR or any predictive coding or methodology to exclude documents from production without agreement of the Parties or Court approval.

In the event that a producing Party decides to use TAR or any other predictive coding or methodology to exclude documents from production, the producing Party shall disclose: (i) the name of the TAR, predictive coding, or other software and vendor, (ii) a general description of how the producing Party's TAR, predictive coding, or other methodology will work, including how it will train the algorithm, such as using exemplars, keyword search strings, or some other method, (iii) a general description of the categories or sources of the documents included or

excluded from the TAR, predictive coding, or other methodology, (iv) the targeted level of recall (e.g., 70%) (if any) and any other standards for stopping review, and (iv) what quality control measures will be taken (the "TAR Disclosure").

Within 14 days of receiving a producing Party's TAR Disclosure, the requesting Party may raise with the producing Party any concerns with the proposed TAR Disclosure or categories of documents that it proposes should be excluded from the TAR or predictive methodology or similar process. A requesting Party may also propose any exemplars it proposes be used to train a TAR tool or predictive methodology or similar process, or narrow keyword search strings it proposes be used to generate exemplars to train a TAR tool or predictive methodology or similar process. A producing Party retains the right to reject and oppose any such requests, subject to resolution by the Court.

The Parties agree to work together in good faith to resolve any differences that they may have over the producing Party's use of TAR, predictive methodology, or similar process and its processes, recall, and validation proposals. If an agreement cannot be timely reached, then the Parties agree to raise this issue with the Court.

C.      **Procedures Governing the Use of Search Terms.**  To the extent that a producing Party believes the use of keyword search terms may be appropriate to reasonably identify potentially responsive documents or to exclude documents from production, the Parties agree to meet and confer regarding the scope of search terms, as follows.

1.      **Search Term Development**

(i)      Unless the Parties agree to additional time, no later than 30 days following service of discovery responses by the producing Party, the producing Party shall provide a list of proposed search terms.

(ii)      Within 14 days after receiving the proposed search terms, the requesting Party shall provide any proposed additional search terms to the producing Party.

(iii)   Within 14 days after receiving the requesting Party's proposed search terms, the producing Party will provide a proposed final set of search terms.

2.      Within 7 days after receiving the final set of search terms, the requesting Party will raise objections regarding any previously-proposed search terms excluded from the final set of search terms. If the requesting Party raises an objection, the Parties will meet and confer to before petitioning the Court for relief.**Second Phase Search Term Proposals**

(i)     The Parties agree that they may each propose additional search terms to a producing Party one time, and by no later than June 6, 2026.  In such an instance, the requesting Party may propose a set of additional search terms. The requesting Party will explain generally the basis for the additional requested terms, which could include, for example, identifying by Bates number exemplar documents that support the request.

(ii)    No later than 14 days after the requesting Party provides an additional set of proposed search terms, the producing Party will provide information sufficient to support its objections to specific additional search terms, which could include, for example, estimates of the incremental number of false positive hits and the incremental number of true positive hits introduced by the disputed additional search terms, as well as examples of the false positive hits.

(iii)   No later than 14 days after the requesting Party proposes an additional set of search terms, the Parties will meet and confer regarding any disputes or counterproposals regarding the additional search terms. To the extent any disputes remain concerning the sufficiency of the producing Party's information in support of its objections and/or the use of specific additional search terms after good faith negotiations have occurred, either Party may move the Court for relief.

3.      **Additional Search Term Requests**

Without regarding to the aforementioned provisions regarding the use of search terms, if words, phrases, abbreviations, terms of art, idiomatic expressions, alternate spellings (or misspellings), or particular linguistic styles which are recurrent or that are unique to the producing

Party, or which are otherwise not presently known to the requesting Party, and such terms are reasonably calculated to lead to the discovery of information relevant to this litigation, then the requesting Party may propose a search of the producing Party's electronically stored information using such additional search term or methodology. As with any Request for Production or for implementation of search methodologies, any such request may be the subject of objection, conferring and, if necessary, direction from the Court.

### 4.      Search and Production

The fact that a document may have been retrieved or identified by application of search terms or TAR shall not prevent any Party from withholding from production such document for privilege, non-responsiveness, or other permissible objection. Notwithstanding the foregoing, to the extent any Party identifies responsive ESI or documents not identified by the use of search terms or filters, all such non-privileged documents must be produced, subject to the Parties' objections to discovery requests, and privileged documents will be logged to the extent required by this agreement.

## III.    FORMAT OF PRODUCTION

A.      **General Production Formats**. The Parties agree to make rolling productions. ESI that can be readily converted to TIFF documents will be produced as TIFF documents pursuant to this order except as set forth below. Where agreed, ESI will be produced in native format with Metadata intact, except where this is not feasible. In this event, the producing Party will promptly notify the requesting Party of the issue, and the Parties will attempt to agree upon an alternative format that is acceptable to the requesting Party.

1.      Excel (or other spreadsheet formats) will be produced in native format. If the producing party deems it necessary to produce redacted Excel (or other spreadsheet formats) in any format other than Native, the producing party shall notify the requesting

Party at the time the production is made. The Parties agree to meet and confer as to any dispute before the issue is submitted to the Court.

2.    The receiving Party may request a specific document or a specific category of documents produced as a TIFF document to be produced in native format upon good cause shown. The Parties agree to meet and confer as to any dispute before the issue is submitted to the Court.

3.    If a document is converted from native format to any other format, the producing Party shall extract and produce the agreed upon metadata, as described below in Section L, from the original Native file, and provide the hash value for the original file.

4.    If the requesting Party deems the alternate format to be insufficient, this will be brought to the attention of the producing Party, and the Parties will meet and confer within five (5) business days of being notified of the issue before submitting the issue to the Court.

**B.    Production Specifications**.

1.    **Native Productions**. All native productions shall be produced in such a way so as to identify and/or maintain the file structure of the data being produced. This shall be accomplished by providing a load file identifying the agreed upon metadata in Section L. Said load files shall be consistent with industry standard load files such as .DAT files and .OPT files. If documents that the Parties have agreed to produce in native format per this protocol are to be used at depositions or attached to pleadings or papers filed with the Court, the Party offering the native document must identify the document as native format and provide the slip sheet provided by the producing Party for each native file including Bates stamp, Protective Order designation, as appropriate, and agreed upon metadata fields for

authentication purposes. A slipsheet shall be produced for all native files at the time of their production, including Bates stamp and Protective Order designation.

2. **Image Productions**.

a. **Physical Documents**. Documents or records that either (i) were originally generated as ESI but now only exist in physical hard-copy format, or (ii) documents or records that were originally generated in hard-copy format, shall be produced as single page TIFF files along with an OCR acquired text file and the agreed upon metadata fields listed in Section L below. When subjecting physical documents to an OCR process, the settings of the OCR software shall maximize text quality over process speed. Any settings such as "auto-skewing", "autorotation" and the like should be turned on when documents are run through the process. The Parties agree to meet and confer as to any dispute before the issue is submitted to the Court.

b. **ESI**. For ESI produced as TIFF images, native format files shall be converted to single-page TIFF images. Accompanying the TIFF images shall be a multipage text (.TXT) file containing searchable text from the native file, and the metadata discussed in Section L below. Load files for the TIFF images should be created and produced together with their associated TIFF images to facilitate the use of the produced images by a document management or litigation support database system. The Parties shall meet and confer to the extent reasonably necessary to determine how such production can be made reasonably usable for the requesting Party, and to facilitate the import and use of the produced materials with commercially available document management or litigation support software.

c.      **Parent-Child Relationships**. Parent-child relationships (the association between attachments and their parent documents) shall be preserved.

C.      **Duplicates**. The Parties are not required to produce exact duplicates of electronic documents stored in different locations. Defendants may globally de-duplicate identical ESI, which will be determined as follows:

- Electronic files will be de-duplicated based upon calculated MD5 or SHA-1 Hash values for the entire file contents. File contents only will be used for MD5 or SHA-1 Hash value calculation and will not include operating system metadata (e.g., filename, file dates) values.

- Messaging files will be de-duplicated based upon MD5 or SHA-1 Hash values in accordance with industry standards.

D.      **Email Threading**. The Parties may use analytics technology to identify email threads and need only produce the unique most inclusive copy and related family members and may exclude lesser inclusive copies. Upon reasonable request, the producing Party will produce a less inclusive copy.

E.      **Color**. Documents or records containing color (for example, graphs, pictures, or color marketing materials) will be produced as color images for each such document or record, to the extent possible. This provision does not apply to hard copy documents or electronic records containing color logos, signatures, watermarks, or letterhead.

F.      **System Files**. Electronic file collection will be "De-NISTed", removing commercially available operating system and application files contained on the National Institute of Standards and Technology ("NIST") file list. Identification of NIST list matches will be through MD5 or SHA-1 Hash values.

G.      **Time Zone**. To the extent reasonably practicable, when processing ESI, Central Standard Time (CST) or Central Daylight Time (CDT) should be selected as the time zone.

**H.** **Archive File Types**. Archive file types (e.g., .zip, .rar) shall be uncompressed for processing. Each file contained within an archive file shall be produced, and the reference to the parent archive file will be provided in the child file name. If the archive file is itself an attachment, that parent/child relationship shall also be preserved.

**I.** **Bates Numbering and Other Unique Identifiers**. Documents produced in native format will be named with a Bates Number, and the original file name will be identified in the load file. For image files (i.e. TIFF images), each page of a produced document shall have a legible, unique page identifier ("Bates Number") electronically stamped onto the TIFF image in such a manner that information from the source document is not obliterated, concealed, or interfered with. All files and documents that are replaced for any reason shall be identified with a "-R" designation appended to the original production number. There shall be no other legend or stamp placed on the document image unless a document qualifies for confidential treatment pursuant to the terms of the Stipulated Confidentiality and Protective Order entered by this Court in this litigation, or has been redacted in accordance with applicable law or Court order. In the case of Confidential Information or Items as defined in the Stipulated Confidentiality and Protective Order, or materials redacted in accordance with applicable law or Court order, a designation may be electronically stamped onto the document's image at a location that does not obliterate or obscure any information from the source document, other than material being redacted.

**J.** **Production Media**. Documents shall be produced on CD-ROM, DVD, external hard drive (with standard PC compatible interface), such other readily accessible computer or electronic media as the Parties may hereafter agree upon, or electronically via secure file share/FTP (the "Production Media"). Each item of Production Media shall include: (1) the name of the producing party; (2) the production date; (3) a unique production volume; and (4) where feasible,

the Bates Number range of the materials contained on such Production Media item, or other description of the items. Each production shall be accompanied by a Production Letter setting forth the date and scope of production. The production letter shall, at minimum, identify the volume of the production, the Bates Number ranges included in the production, and statement regarding whether the production contains any category of Protected Material as designated pursuant to the Stipulated Confidentiality and Protective Order entered in this matter.

**K.**      **Electronic Text Files**. For each document, a single text file shall be provided along with the native or image files and metadata. The text file name shall be the same as the Bates Number of the first page of the document. File names shall not have any special characters or embedded spaces. Electronic text shall be extracted directly from the native electronic file unless the document was redacted, an image file, or a physical file. In these instances a text file created using OCR will be produced in lieu of extracted text. Where feasible, if the producing Party has access to extracted text from electronic document files, the receiving Party shall receive extracted text as well, instead of OCR text generated from an image file. If such conversion is unduly burdensome or renders the document unusable, the producing Party may produce the document in any reasonably usable form as may be agreed upon by the respective Parties. The Parties shall meet and confer regarding any disputes relating to the availability of extracted text.

**L.**      **Metadata**. The following list identifies the metadata fields and manually generated fields that will be included in Load files, to the extent applicable and available:

- FIRSTBATES
- LASTBATES
- BEGATTACH
- ENDATTACH

-12-

- PARENT_BATES

- ATTACHMENTS

- CUSTODIAN(S) (ALL CUSTODIANS IN ONE FIELD)

- FROM

- TO

- CC

- BCC

- SUBJECT

- EMAIL SENT DATE (CST OR CDT TIME ZONE)

- EMAIL RECEIVED DATE (CST OR CDT TIME ZONE)

- FILENAME

- FILE_EXTEN

- AUTHOR

- DATE CREATED

- REDACTED

- FILE_SIZE

- FILETYPE

- INTMSGID

- HASH_VALUE TEXTLINK

- NATIVELINK

- PAGE_COUNT

- PROD_VOLUME

- SUBJECT TO PROTECTIVE ORDER (FLAG YES OR NO)

- APPLICATIONNAME

- LASTAUTHOR

Such metadata fields will be produced to the extent available, except that they may be suppressed or redacted if privileged or information protected by law or as otherwise agreed. The Parties are not obligated to populate manually any of the metadata fields set forth above if such fields cannot be reasonably extracted from a document or other media. Parties agree to meet and confer if additional fields of metadata are needed.

**M.** **Attachments**. Email attachments and embedded files will be mapped to their parent by attachment range within the Load file.

**N.** **Structured Data**. To the extent a response to a non-objectionable discovery request requires production of discoverable electronic information contained in a database, the producing Party shall notify the requesting Party and the Parties shall promptly meet to attempt to resolve the issue. If the producing party asserts that production of a database in native is not practicable, the producing party may advise of a preference to (l) produce existing reports or reports readily able to be generated from the database that are reasonably responsive to the discovery requests, or (2) design queries in order to produce an extract from the database of relevant and responsive data in a reasonably usable and exportable electronic file (e.g., Excel, Access, CSV or Microsoft SQL server database format). Any production of a database not in its native format should be fully parsible. For enterprise database systems from which data will be produced, the Parties will meet and confer as to the available data in the system, the data to be exported, and the format of production on a case by case basis. The producing Party agrees to disclose the search parameters used to design the reports and/or queries prior to the production. Upon review of any such parameters and productions from structured databases, the requesting party may make reasonable

requests for additional information to explain the database schema, fields, codes, abbreviations, and different report formats, and may object to this method of production.

## IV.    OBJECTIONS TO ESI PRODUCTION

If any formatting requirements or other specifications agreed to in this protocol are later determined by the producing Party to be not feasible, or unduly burdensome or unreasonably costly, the Parties will promptly meet and confer in order to attempt to agree upon appropriate modifications to the protocol before presenting any such issue to the Court.

Notwithstanding anything contained herein to the contrary, a producing Party shall not produce ESI in a format not requested or agreed to by the requesting Party. If an issue arises, the issue will only be submitted to the Court after reasonable efforts by the Parties to reach agreement by the meet and confer process.

## V.    FOREIGN DATA PRIVACY LAWS

No provision of this ESI Protocol is intended to prevent either Party from complying with the requirements of a foreign country's data privacy laws, e.g., the European Union's General Data Protection Regulation (GDPR) (EU) 2016/679. To the extent that either Party identifies a document subject to a foreign country's data privacy laws, including the GDPR, that cannot reasonably be produced in full without violating that foreign country's data privacy laws, including the GDPR, at the time such document would otherwise be produced or redacted, the withholding or redacting Party shall advise the requesting Party and the Parties may then agree to meet and confer as the basis for the withholding or redaction. The withholding Party shall, at such meet and confer, provide a description of the withheld or redacted document and the basis for its withholding. Prior to withholding a document on this basis, the withholding Party shall first try to segregate data covered by a foreign country's data privacy laws or to redact such data. Nothing in this provision shall operate as a waiver of the requesting Party's ability to challenge the

appropriateness of such withholding or redaction.

## VI.    PRIVILEGE AND WORK PRODUCT CLAIMS

The Parties agree that, for documents either withheld from production or produced in a redacted form on the basis of attorney-client privilege or the work product doctrine and/or any other applicable privilege, the producing Party will provide a privilege log in an electronically searchable format (e.g., Excel), containing, for each document claimed as privileged. Consistent with Fed. R. Civ. P. 26(b)(5), the following information should be provided (as applicable) in the privilege log for each document: (1) unique document identification number or bates number; (2) document type; (3) family relationship; (4) date; (5) author; (6) each recipient broken out separately to provide email To, CC and BCC info; (7) custodian, (8) privilege or protection claimed; and (9) description of the subject matter of the document or electronically stored information sufficient to enable the requesting party to assess the validity of the privilege claim.

Privilege logs will be produced no later than 45 days after a Party's production of documents is substantially complete, unless an alternative deadline is agreed to by the Parties.

If the requesting Party requires further information, it shall explain in writing the need for such information and identify, by Bates Number or other unique identifier, each document for which it seeks this information. Within thirty (30) days of such a request, the producing party must either (i) provide the requested information or (ii) challenge the request. Either Party may seek to expedite this time period upon good cause shown. If a Party challenges a request for further information, the Parties shall meet and confer to try to reach a mutually agreeable solution. If they cannot agree, the Parties must request a conference with the Court before any motions may be filed. Withdrawal of privilege designations shall be noted on the privilege log, indicating the fact and date of withdrawal of the privilege designation.

The obligation to provide a privilege log presumptively shall not apply to: (a) attorney

work product created by or at the direction of counsel for the Parties regarding this litigation; (b) communications within counsel for the Parties, or between counsel and consultants, investigators, or other third parties assisting counsel with the litigation, regarding this litigation, and (c) communications between the Parties and counsel for the Parties regarding this litigation. The Parties agree to confer regarding other categories of information that may be excluded from logging requirements. With respect to privileged or work-product information generated after the filing of the complaint, the Parties are not required to include any such information in privilege logs.

During the course of its review, should a producing Party identify an unduly burdensome quantity of emails that must be logged for privilege, the Parties will meet and confer regarding whether it may be sufficient to log the 'string' without separate logging of each included communication. If such string logging is agreed to by the Parties, reference to the document as an "email string" should be made in the document description field of the log, and to the extent that different emails within the email string are protected by different privilege bases, the log shall separately identify that within the email string certain emails are subject to one particular privilege claim and other emails within the string are subject to a different privilege claim.  Email strings that are not privileged in their entirety should be redacted if they contain responsive, non-privileged content.  The Parties will meet and confer if a receiving Party requests additional information to validate the claim of protection for a specific email string.

Activities undertaken in compliance with the duty to preserve information are protected from disclosure and discovery under Fed. R. Civ. P. 26(b)(3)(A) and (B).

Pursuant to Fed. R. Evid. 502(d), the production of any documents in this proceeding shall not, for the purposes of this proceeding or any other federal or state proceeding, constitute a waiver

by the producing Party of any privilege applicable to those documents, including the attorney-client privilege, attorney work-product protection, or any other privilege or protection recognized by law. Information produced in discovery that is protected as privileged or work product shall be promptly returned to the producing Party, and its production shall not constitute a waiver of such protection.

## VII.    VARIANCE

Any practice or procedure set forth herein may be varied by agreement of the Parties without order of the Court.  Failure of the Parties to agree on any modifications for good cause shown may be raised with the Court as necessary and in accordance with the Federal Rules of Civil Procedure.

## VIII.    COOPERATION AND GOOD-FAITH NEGOTIATION

All Parties agree conduct discovery in a cooperative manner, including by reasonably drafting discovery requests and responses, and producing ESI responsive thereto, in accordance with the Federal Rules of Civil Procedure and applicable local rules; and by meeting and conferring in good faith on topics such as the identification of custodians of relevant ESI, potentially relevant data sources, search methodologies, cost of production and allocation, and such other issues as may arise during the course of discovery. The Parties further agree to negotiate in good faith any issues which arise concerning the terms of this ESI Protocol, or any other issues that arise in the course of document productions during the litigation. The Parties shall meet and confer regarding requests to seek additional documents outside the scope of this this ESI Protocol and/or to seek to revise the terms of this this ESI Protocol if an issue arises regarding the economic value of the production and/or the technical ability to review and/or produce pursuant to this this ESI Protocol before any Motion to the Court regarding the same can be filed.

## IX.    PROTECTIVE ORDER

This ESI Protocol incorporates the provisions of the Stipulated Confidentiality Agreement and Protective Order in this case. No provision of this ESI Protocol shall be interpreted as inconsistent with the Protective Order, and if there is a conflict between any provision of this ESI Protocol and the Protective Order, the provision of the Protective Order shall prevail.

**SO ORDERED.**

Dated: __March 26, 2026__                               /s/ Angel Kelley
                                                                              _____
                                                                              HON. ANGEL KELLEY
                                                                              UNITED STATES DISTRICT JUDGE

IT IS SO STIPULATED, THROUGH COUNSEL OF RECORD

DATED this 20th day of February, 2026.


/s/ Yitzchak Kopel                                          /s/ Eva Yang
**BURSOR & FISHER, P.A.**                         **NORTON ROSE FULBRIGHT US LLP**
Yitzchak Kopel (BBO #716245)                      Jeffrey B. Margulies (CAB #126002)
Max S. Roberts (BBO #718031)                      Eva Yang (CAB #306215)
1330 Avenue of the Americas, 32nd Floor      Alexandra M. Perez (CAB #350867)
New York, NY 10019                                       555 South Flower Street
Tel: (646) 837-7150                                          Forty-First Floor
Fax: (212) 989-9163                                         Los Angeles, California 90071
E-mail: ykopel@bursor.com                            Telephone: (213) 892-9200
          mroberts@bursor.com                          Facsimile: (213) 892-9494
                                                                         jeff.margulies@nortonrosefulbright.com
                                                                         eva.yang@nortonrosefulbright.com
**SMITH KRIVOSHEY, P.C.**                        alexandra.perez@nortonrosefulbright.com
Joel D. Smith (BBO #712418)
867 Boylston Street, 5th Floor                        *Attorneys for Defendants*
Boston, MA 02116
Telephone: (617) 377-7404
Email: joel@skclassactions.com


*Attorneys for Plaintiff*